UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

NATALIE MASTERS )
)
v. ) No. 2:07-0003
) JUDGE CAMPBELL
TOWN OF MONTEREY, TENNESSEE )

MEMORANDUM

I. Introduction

Pending before the Court is Defendant's Motion For Summary Judgment (Docket No. 10). For the reasons set forth below, Defendant's Motion For Summary Judgment (Docket No. 10) is GRANTED, and this action is DISMISSED.

II. Factual and Procedural Background

Plaintiff Natalie Masters filed this action alleging gender or pregnancy discrimination based on Title VII, 42 U.S.C. § 2000e-5, and the Tennessee Human Rights Act, §§ 4-21-101, et seq., ("THRA"), arising out of her employment as a police officer with the Town of Monterey Police Department. (Complaint (Docket No. 1)). In her Complaint, Plaintiff alleges that after advising her superior that she was pregnant, her superior began to harass her until she felt she had no choice but to resign her employment. (Id., at ¶ 12).

The parties have stipulated to the following undisputed material facts. (Docket No. 17). Plaintiff was an employee of the Town of Monterey from January, 1999 until her resignation on May 3, 2006. (Id., at ¶ 1). Plaintiff initially worked for the water department, but became a police officer for the Town of Monterey in February, 2004. (Id., at ¶ 2; Deposition of Natalie Masters, at 25 (Docket No. 11)). Plaintiff claims that she was harassed by her supervisor, Chief

Bruce Breedlove, when she advised him on April 14, 2006 that she was pregnant, and that he pressured her to resign to avoid the perceived complications to the department that would be caused by her maternity leave. (Id., at ¶ 3; Affidavit of Natalie Masters, at ¶¶ 2-4 (Docket No. 17)). Plaintiff claims that she told Chief Breedlove she would resign her position if she would be paid her accumulated sick leave; and she would be allowed to attend a forty-hour in-service training that she needed to keep her P.O.S.T. Certification. (Masters Affidavit, at ¶ 4). She did not ultimately receive these benefits when she resigned. (Docket No. 17, at ¶ 5). Plaintiff accepted a position with the Putnam County Sheriff's Department on May 3, 2006, which was the same day she submitted her resignation to the Town of Monterey. (Masters Deposition, at 40).

Plaintiff knew that the Town of Monterey's personnel policies and procedures provide that the Civil Service Board had the authority to hire and fire her. (Docket No. 17, at ¶¶ 4, 12). Plaintiff claims, however, that Chief Breedlove had de facto hiring and firing authority. (Id.) Plaintiff had signed an Employee Acknowledgment of Town of Monterey Personnel Rules and Regulations in which there was a sexual harassment policy which prohibited sexual harassment of its employees. (Id., at ¶ 6; Exhibit Nos. 2, 3 to Masters Deposition). Plaintiff did not report the alleged harassment by Chief Breedlove to the Civil Service Board. (Id., at ¶ 7). Plaintiff was not reassigned nor were her benefits affected as a result of the conduct of Chief Breedlove. (Id., at ¶ 8).

In his Affidavit, Mayor Ken Wiggins states that he met with the Plaintiff and Chief Breedlove regarding Plaintiff's resignation on May 10, 2006. (Affidavit of Ken Wiggins, at ¶ 2 (Docket No. 19)). During the meeting, Plaintiff acknowledged that she had already accepted

full-time employment with the Putnam County Sheriff's Department. (Id., at ¶ 4). Mayor Wiggins explained to the Plaintiff that it would be inappropriate for her to attend an in-service training as the Town's representative because she was employed full time with the Sheriff's Department. (Id., at ¶ 4). The Mayor also informed the Plaintiff that the Town's Personnel Rules and Regulations did not permit an employee to be paid accumulated sick leave at separation when she was working full time for another employer. (Id., at ¶¶ 5-7). Mayor Wiggins states that Plaintiff did not advise him of any harassment during that meeting or at any other time. (Id., at ¶ 8).

According to Mayor Wiggins, on June 16, 2006, Chief Breedlove was involved in a motorcycle accident and suffered a serious head injury which prevents him from being able to communicate effectively. (Id., at ¶ 10).

Plaintiff previously reported an incident of sexual harassment in June, 2000 against an alderman when the Plaintiff was working in the Town of Monterey water department. (Docket No. 17, at ¶ 9; Masters Deposition, at 50-52). On June 7, 2000, a letter was sent to the harasser directing him to cease any offensive, intimidating or hostile behavior. (Id., at ¶ 10). Plaintiff encountered no further difficulties with the harasser. (Id., at ¶ 11).

### III. Analysis

#### A. The Standards for Considering Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment may be rendered if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c);

3

Abdulnour v. Campbell Soup Supply Co., LLC, 502 F.3d 496, 501 (6th Cir. 2007).

In order to prevail, the movant has the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). In determining whether the movant has met its burden, the Court must view the evidence in the light most favorable to the nonmoving party. Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); Abdulnour, 502 F.3d at 501.

In order to defeat the motion, the nonmoving party is required to show, after an adequate time for discovery, that there is a genuine issue of fact as to every essential element of that party's case upon which he will bear the burden of proof at trial. Celotex Corp., 106 S.Ct. at 2553; Abdulnour, 502 F.3d at 501. To create a genuine factual issue, the nonmoving party must show "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Although the nonmovant need not show that the disputed issue should be resolved in his favor, he must demonstrate that there are genuine factual issues that "properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. See also Abdulnour, 502 F.3d at 501.

A preponderance of the evidence standard is used in this determination. Id. Therefore, if the evidence offered by the nonmoving party is "merely colorable," or "is not significantly probative," the motion for summary judgment may be granted. Id. See also Matsushita Electric, 106 S.Ct. at 1356.

B. Title VII/THRA

4

In her brief, Plaintiff argues that she can establish a prima facie case of discrimination based on her pregnancy, which is analyzed in the same manner as a gender discrimination claim. In Cline v. Catholic Diocese of Toledo, 206 F.3d 651, 657-58 (6th Cir. 2000), the court explained that to establish a prima facie case of discrimination based on pregnancy, the plaintiff must show: (1) she was pregnant; (2) she was qualified for her job; (3) she was subjected to an adverse employment decision; and (4) there is a nexus between her pregnancy and the adverse employment decision. If the plaintiff successfully establishes a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. Id. If the defendant satisfies this burden, the presumption of intentional discrimination is negated, and the employee must then prove by a preponderance of the evidence that the defendant intentionally discriminated against her by showing that the employer's proffered reasons were not credible, but were merely a pretext for intentional discrimination. Id. See also Spann v. Abraham, 36 S.W.3d 452, 463 (1999)(Tennessee courts look to decisions of federal courts construing Title VII in analyzing claims brought under the THRA).

To establish the third element of the prima facie case, that she suffered an adverse employment action, Plaintiff contends that because of her pregnancy, she was subjected to harassment that created a hostile work environment leading to her constructive discharge. To establish hostile work environment, plaintiff must show that the harassing behavior was sufficiently severe or pervasive to alter the conditions of her employment. Pennsylvania State Police v. Suders, 542 U.S. 129, 124 S.Ct. 2342, 2347, 159 L.Ed.2d 204 (2004). Constructive discharge requires a further showing that "the abusive working environment became so intolerable that her resignation qualified as a fitting response." Suders, 124 S.Ct. at 2347.

The Supreme Court has explained that an employer may defend against such a claim by showing both "(1) that it had installed a readily accessible and effective policy for reporting and resolving complaints of sexual harassment, and (2) that the plaintiff unreasonably failed to avail herself of that employer-provided preventive or remedial apparatus." Id.  This defense, recognized in Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) and Faragher v. Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), is not available, however, "if the plaintiff quits in reasonable response to an employer-sanctioned adverse action officially changing her employment status or situation, for example, a humiliating demotion, extreme cut in pay, or transfer to a position in which she would face unbearable working conditions." Suders, 124 S.Ct. at 2347.

C. Faragher/Ellerth Affirmative Defense

The Defendant argues that it is entitled to summary judgment because the Plaintiff cannot establish that she was constructively discharged, and because the Faragher/Ellerth affirmative defense precludes liability under the facts presented.  As the Court finds that Plaintiff's claims are precluded by application of the Faragher/Ellerth affirmative defense, it is unnecessary to determine whether Plaintiff can establish constructive discharge.

Plaintiff argues that the affirmative defense does not apply in this case because she suffered a tangible job detriment because the "Chief of Police and the Mayor were involved in discussing the terms of Plaintiff's separation, and in that regard, the Town clearly sanctioned Plaintiff's resignation." (Plaintiff's Memorandum Of Facts And Law In Support Of Plaintiff's Response In Opposition To Defendant's Motion For Summary Judgment, at 10 (Docket No. 17)).  Plaintiff has offered no proof, however, indicating that the Mayor, or more importantly, the

hiring authority for the Town of Monterey, the Civil Service Board, *requested* her resignation or otherwise terminated her employment. Indeed, Plaintiff admits that she did not mention any harassment to the Mayor during the meeting regarding her resignation. (Masters Deposition, at 80).

Plaintiff also suggests that Chief Breedlove must have had hiring authority for the Town of Monterey because he made statements to her and others about whom he would hire and fire in the future. Plaintiff's deposition makes clear, however, that she knew the hiring authority for the Town of Monterey was the Civil Service Board:

> Q. Well, does Chief Breedlove hire and fire people at the Town of Monterey?
>
> A. No, he doesn't.
>
> Q. Civil Service Board, doesn't it – hires and fires, doesn't it?
>
> A. They sure do.
>
> Q. In fact, the chief of police didn't have the ability to fire you, did he?
>
> A. No.
>
> Q. It had to go to the Civil Service Board.
>
> A. He had the opportunity to dismiss; but, of course, it would have to go before the Civil Service Board.

(Masters Deposition, at 27).

Thus, Plaintiff has failed to create a genuine issue of material fact that her resignation was requested by, or in any way initiated by, the hiring authority for the Town of Monterey. Accordingly, Plaintiff has not established that she suffered a tangible job detriment, and therefore, the Defendant may rely on the Faragher/Ellerth affirmative defense.

As set forth above, in order to establish the affirmative defense, the Defendant must show

7

that it had installed a readily accessible and effective policy for reporting and resolving complaints of sexual harassment, and that the Plaintiff unreasonably failed to avail herself of that employer-provided preventive or remedial apparatus.  Plaintiff has admitted that she signed an Employee Acknowledgment of Town of Monterey Personnel Rules and Regulations, which included a sexual harassment policy prohibiting sexual harassment of the Town's employees. She has also admitted that she did not report Chief Breedlove's harassment to the Mayor, the Civil Service Board, or anyone in management for the Town of Monterey. (Masters Deposition, at 34-35).

Plaintiff claims that she did not report the harassment because she thought it would be futile. Plaintiff has failed to cite any factual support in the record, however, for this belief.  As discussed above, Plaintiff previously reported an incident of sexual harassment in June, 2000 against an alderman when she worked for the Town of Monterey water department.[1] A letter was

---

[1]  Plaintiff submitted a written statement at the time of the incident, which states in part:

On Friday, June 2, 2000 around 3:00 p.m. Alderman Marson Gentry came out of Chief Breedlove's office and came into the office where Ella Dishman and I were discussing water bills. You could visibly see that he was upset about something and was cursing Richard Lynch.  He turned around and looked at me and ask (sic) me if I was married.  I told him yes I was and he backed away like he was being funny.  He then walked back over to me and grabbed me by the head and whispered 'I've got plenty of money.' I then said aloud looking at Ella 'So you've got a lot of money huh?'  I was very shocked and disgusted.  He then went back over by the door and said 'Do you want me to show it to you?'  At this point I was not for sure if he was talking about exposing himself or his money until he pulled out his wallet.  He then proceeded to pull out several 100 dollar bills.  He said 'See, the Copeland's are not the only ones with . . . money.' I said 'Marson, you better watch it walking around with all of that money in your pocket.'  He said that's okay.  I got my pistol in my pocket and patted his pocket.  I then turned around and walked back into my office.  When he was gone I came back into Ella's office and said 'Can you believe he did that?'  For the record I would like to say I do not feel comfortable with Mr. Gentry being in a (sic) administrative

then sent to the harasser directing him to cease the offensive behavior, and Plaintiff admits she encountered no further difficulties with him.[2] In her deposition, Plaintiff indicates that she was dissatisfied with this outcome because the harasser did not apologize to her personally, nor was he required to resign. (Masters Deposition, at 52-55). Plaintiff's dissatisfaction, however, is insufficient to show that the employer's sexual harassment policy was ineffective, and to excuse

---

position over me.

(Exhibit 4 to Masters Deposition (Docket No. 11)).

[2] The letter, dated June 7, 2000, from counsel T. Michael O'Mara to Marson Gentry, states as follows:

> The purpose of my writing is to insist that you modify your behavior when you are dealing with members of the office staff of the Town of Monterey. Your conduct on June 2, 2000, through the things you did and the things you said, shocked and intimidated the office staff. Both state and federal law prohibit an employer from allowing the creation or continuation of a hostile work environment of the type you created on June 2. The Tennessee Supreme Court found that hostile work environment harassment occurs 'where the conduct has the purpose or effect of unreasonably interfering with an individuals (sic) work performance or creating an intimidating, hostile or offensive working environment.'
> As the employer of the office staff, the Town of Monterey is required to take prompt and appropriate remedial action which may be reasonably calculated to terminate the harassment. As an alderman it obvious (sic) you are entitled to frequent the offices of the Town of Monterey and to interact with its personnel. However, in the future you must refrain from behavior of the type which you engaged in on June 2 which would serve to intimidate or threaten the office staff. If you fail to do so you may expose the Town of Monterey to civil rights litigation regarding the creation of a hostile work environment.
> This is a very difficult letter for me to write because as the Town attorney I frequently render legal advice to you. If this letter offends you, I apologize in advance. However, the Town of Monterey is required under both state and federal law to take reasonable steps to protect its employees and this seemed like the most effective means of communicating this very serious circumstance to you.

(Exhibit 5 to Masters Deposition (Docket No. 11)).

her from the requirement that she report the harassment. See Idusuyi v. Tennessee Department of Children's Services, 30 Fed. Appx. 398, 404 (6th Cir. Feb. 11, 2002)("We agree that it is unreasonable for employees to pass their own judgments - absent any supporting facts - about how effectively an employer's sexual harassment policies operate.") Plaintiff has failed to create a genuine issue of material fact that her refusal to avail herself of the Town's remedial apparatus was reasonable. Accordingly, the Defendant has established the elements of the Faragher/Ellerth affirmative defense, and is, therefore, entitled to summary judgment on Plaintiff's claims.

## IV. Conclusion

For the reasons set forth herein, the Defendant's motion for summary judgment is granted.

It is so ORDERED.

*[signature: Todd Campbell]*
TODD J. CAMPBELL
UNITED STATES DISTRICT JUDGE